## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

DEBORAH CAMPBELL,

       Plaintiff,

vs.

STATE OF IOWA THIRD JUDICIAL
DISTRICT DEPARTMENT OF
CORRECTIONS, STEVE SCHOLL, in
his official capacity; and, LINN HALL,
in his individual capacity.

       Defendants.

No. C09-4087-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

*I.* *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   *A.* *Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . 30
   *B.* *Effect of Settled Grievances* . . . . . . . . . . . . . . . . . . . . . . . . 36
   *C.* *Eleventh Amendment Immunity* . . . . . . . . . . . . . . . . . . . . . . 40
   *D.* *Title VII Sexual Discrimination Claims* . . . . . . . . . . . . . . . . . 42
      *1.*    *Elements of disparate treatment claim* . . . . . . . . . . . . . . . 43
      *2.*    *Campbell's* **prima facie** *case* . . . . . . . . . . . . . . . . . . . . . 44
      *3.*    *Defendants' legitimate, nondiscriminatory reason* . . . . . . . . 45
      *4.*    *Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   *E.* *Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

|  | *1.* | *Campbell's* **prima facie** *case* | 50 |
|  | *2.* | *Defendants' legitimate, nondiscriminatory reason* | 51 |
|  | *3.* | *Pretext* | 51 |
| *F.* | *First Amendment Retaliatory Discharge* | | 53 |
|  | *1.* | **Prima facie** *case of retaliation* | 54 |
|  | *2.* | *Qualified immunity* | 57 |
|  |  | *a.  A violation of a constitutional right* | 58 |
|  |  | *b.  Clearly established right at the time* | 59 |
| *G.* | *Age Discrimination Claim* | | 61 |
|  | *1.* | *The circumstantial evidence paradigm* | 63 |
|  | *2.* | *Analysis—plaintiff's showing of pretext* | 65 |

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

A former female Community Program Monitor of a state district correctional services agency alleges that she was subjected to sex and age discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act, IOWA CODE CH. 216.   She also alleges she was retaliated against for voicing her opposition to changes to a domestic batters program that placed the victims' safety at issue, in violation of the First and Fourteenth Amendments, and Iowa's whistleblower statute, IOWA CODE § 70A.28(2), and Iowa public policy.   Against this panoply of claims, the defendants—the state district correctional services agency and its

current and former directors—have moved for summary judgment on all of the plaintiff's claims.  Thus, I must determine which, if any, of the plaintiff's claims should go to a jury.

## I.  INTRODUCTION AND BACKGROUND

### A.  Procedural Background

On November 23, 2009, plaintiff Deborah Campbell filed a Complaint against her former employer, defendant the Third Judicial District Department of Correctional Services ("Third Judicial District") and the Third Judicial District's Director, Linn Hall, alleging the following causes of action:  (1) claims of sex discrimination and retaliation in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Counts I and II); (2) a claim under 42 U.S.C. § 1983, contending that defendants violated her right to freedom of speech under the First and Fourteenth Amendments by retaliating against her for objecting to the inclusion of victim information in reports which would be disclosed to domestic violence perpetrators; (3) pendent state law claims under the Iowa Civil Rights Act ("ICRA") for sex and age discrimination, and retaliation, IOWA CODE CH. 216 (Count IV); (4) a pendent state law claim that she was wrongfully terminated in violation of Iowa's whistleblower statute, IOWA CODE § 70A.28(2) (Count V); and (5) a pendent state common law claim that she was wrongfully terminated in violation of public policy (Count VI).[1]

On August 1, 2011, defendants filed their Motion For Summary Judgment.  First, defendants claim that a settlement of grievances filed on Campbell's behalf bars any

---

[1]Defendant Hall died on September 19, 2011.  On October 24, 2011, Campbell filed an Amended Complaint in which she reasserted the same claims, but named Hall's replacement, Steve Scholl, in his official capacity as the new Director of the Third Judicial District.  She also named Hall in his individual capacity.

subsequent claims arising from the conduct at issue in those grievances.   Second, defendants contend that Eleventh Amendment immunity bars prosecution of Campbell's state law claims against the Third Judicial District as well as her claims against Scholl in his official capacity for monetary damages.   Third, defendants seek summary judgment on Campbell's sex discrimination claims on the ground that Campbell is unable to produce circumstantial evidence which could reasonably support an inference of sex discrimination. Fourth, defendants argue Campbell's Title VII retaliation claim fails because she has not presented sufficient evidence of the causal connection between her protected activity and defendants' adverse actions.   Fifth, defendants seek summary judgment on Campbell's First/Fourteenth Amendment relation claim on the ground that Campbell was not speaking as a citizen when she voiced her concerns over the inclusion of victim information, so her speech was not protected by the First Amendment.   Alternatively, defendants argue Hall is entitled to qualified immunity from liability for damages on Campbell's First/Fourteenth Amendment claim.   Finally, defendants seek summary judgment on Campbell's ICRA age discrimination claim against Scholl in his official capacity for injunctive relief because Campbell has not presented sufficient evidence supporting an inference of age discrimination and rebutting defendants' asserted legitimate, non-discriminatory reason for her firing.   On September 6, 2011, Campbell resisted defendants' Motion for Summary Judgment, arguing that there are genuine issues of material fact in dispute regarding all of her federal claims.   Campbell concedes that the Eleventh Amendment bars her state claims against the Third Judicial District in federal court.   On September 26, 2011, defendants filed their reply brief in support of their Motion for Summary Judgment.

### B. *Factual Background*

I will set forth sufficient facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' Motion for Summary Judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in my legal analysis.

Plaintiff Deborah Campbell is a former employee of the Third Judicial District Department of Correctional Services ("Third Judicial District"). Defendant Linn Hall was the Third Judicial District's Director while Campbell was employed there. She was originally hired by Family Services in 1994 as a grant coordinator for the Batterers' Educational Program ("BEP"). In 1998, this position was picked up by the Third Judicial District. Although her duties remained the same, her title was changed to Community Program Monitor. As the Community Program Monitor, Campbell coordinated the Third Judicial District's BEP. The Third Judicial District's BEP is state-accredited by the Iowa Department of Corrections. Campbell's supervisor at the Third Judicial District was Jeff Page until he retired in 2006. Campbell received superior work evaluations from Page. Hall had no complaints about Campbell's work performance prior to 2006. He signed off on her excellent performance reviews from Page.

The Third Judicial District utilizes a program know as the "Duluth Model" for its BEP. The Duluth Model was adopted statewide by the State of Iowa to deal with domestic abuse. The Duluth Model is based on community participation in order to hold perpetrator's accountable and to ensure victim and community safety. The Duluth Model has been incorporated into the BEP standards adopted by the Iowa Department of Corrections. Hall relied upon Campbell, based on her experience in the field of domestic

violence, to set up the Duluth Model in the Third Judicial District.   Campbell described her duties as follows:

> There was no typical day but I can tell you the duties. The main duty was to connect everyone in the community together on the issue of domestic violence. And so everybody would be saying the same thing, so it was going to the judges that were apologizing to batterers for ordering them to do the program, to get them to stop doing that, to hold the County Attorney responsible for not dropping cases, to talk to victims services to make sure the police were dealing with them respectfully, to having a community coalition that all the different systems would come and meet at.
>
> Part of it was being on other different systems to continue education with other groups. Part of it was to hold a [sic] educational piece for the community every year. To monitor the Court orders for the batterers's program and in working with all of those systems.

Campbell Dep. at 16-17, Plaintiff's App. at 40-41.

Campbell's job duties also involved extensive work with the courts, such as advising the courts to hold batterers accountable through contempt actions. She did not have her own secretary or staff but interacted with probation officers due to the required sharing of information. She did her own clerical work. Campbell also went to numerous community events in order to build awareness and put on a symposium to increase awareness of the BEP. Essentially, Campbell was a liaison for various agencies and officials in the domestic violence area and the BEP.

On July 13, 2006, Campbell's supervisor, Jeff Page, retired. Within four days of Page's retirement, Campbell's interim supervisor, Steve Middleton, called Campbell into his office. Middleton ordered her not to bring any books to work; to stop visiting with

6

another co-worker, and asked Campbell whether all of her trips to the copy machine were necessary. Middleton does recall meeting with Campbell with respect to redefining her job duties but does not recall ordering her not to bring any books to work.

Campbell has seen Middleton harass female employees to tears. She believes it is common knowledge in the Third Judicial District that he always has one female employee who he chooses to pick on and harass. From Campbell's observations, he did not do this to any male employees in the office. As an example, Campbell alleges that Phil Welte, a Drug Court Officer, would stand around for hours and talk to his co-workers without ever being reprimanded. Defendants dispute that Middleton picked female staff members to harass. Defendants also contend that Middleton has spoken to both male and female employees about having non-work related conversations in the workplace.

Campbell's employment relationship with Hall began to significantly deteriorate after Karen Borg became Campbell's supervisor on September 8, 2006. Before Borg became Campbell's supervisor, Middleton advised Borg that he had difficulties with Campbell and that Borg would need to document her dealings with Campbell. Hall placed Borg in a position to supervise Campbell even though she did not have experience in the Duluth Model program. On October 13, 2006, Borg called Campbell into her office and advised Campbell of changes she was to make running the BEP. Campbell attempted to inform Borg about the BEP and how the requested changes would have a negative impact on victim safety and put a stop to community involvement in a national research project. Preserving the confidentiality of victims of domestic violence is one of the rules for maintaining accreditation for a BEP. Borg responded by putting a hand up in front of Campbell's face to stop her from talking. Campbell asked Borg if she could take this slowly and learn more about the BEP before making any major changes. Borg told

Campbell she was going to make the changes anyway.  After this encounter, Campbell went to Hall concerning Borg's changes to her job duties, as well as her concerns with victim safety.  Hall discounted and dismissed Campbell's concerns.

The first issue of contention between Borg and Campbell was documentation or filing in the Iowa Corrections Offender Network ("ICON") system.  The ICON is an online electronic case file that was created to replace paper case files.  In early 2007, Campbell expressed concern about Borg's orders to have her place victim information in the ICON notes.  Campbell was concerned that this would allow an offender access to information about the victim in the offender's records, contrary to a treatment program rule.  Campbell complained about confidential victim information being placed in offender files both within the Third Judicial District and outside it to the Community Coalition Against Domestic Violence ("Community Coalition").[2]  Campbell informed Hall and Borg of the BEP accreditation rules and that the victim information could not be put in the general files for anyone to see.  Campbell further advised Hall and Borg that their actions were in violation of the Duluth Model which had been adopted by the Iowa Department of Corrections to deal with batterers.

Another issue to arise was that Borg did not want Campbell's intern to be at the Third Judicial District when Campbell was not present.  Before retiring, Campbell's prior supervisor, Jeff Page, had asked Campbell to supervise an intern from Briar Cliff University as a favor.  Borg thought Campbell was having the intern perform her job.

---

[2]The Community Coalition is a group of entities, including the state judiciary branch, county attorneys, police departments, and counseling facilities, brought together for a community-based response to domestic violence.

Campbell denies that the intern was performing her duties and contends that she continued to do all aspects of her job.

Campbell went to Hall numerous times regarding her job and told him how Borg would not meet with her to learn about the BEP.[3]  Campbell again told Hall that she had an issue with regard to victim safety and that Borg's directives to her were against the BEP accreditation rules regarding victim safety.  Hall told Campbell her information was inaccurate.  Campbell showed Hall an e-mail from the Central Office of the Department of Corrections in Des Moines confirming her concerns, but she received no response from Hall.  Campbell believes that neither Borg nor Hall shared her concern for victim safety and repeatedly dismissed Campbell's complaints about the impact their changes would have on victim safety.  Defendants dispute Campbell's assertions.  Defendants contend they expressed their concern for the confidentiality of victim information and told Campbell that her concerns for victim information confidentiality would be taken care of by placing the victim information in a separate database.  Campbell contends defendants never told her about the separate database.

Campbell's efforts in September, October, and November 2006, to get her concerns addressed by management, were unproductive.  Therefore, in November 2006, Campbell went to her union representative, Paula Barker, to arrange a meeting with Leesa McNeil, a member of the Board of the Third Judicial District ("the Board").[4]  McNeil is the Court

---

[3]The parties dispute when Campbell went to Hall about her concerns.  Campbell alleges that these events occurred in October 2006, while defendants contend that they did not occur until January 2007.

[4]Barker has been employed by the Third Judicial District since 1983.  She was promoted to probation/parole officer in 2000.  She is also the union steward for the
(continued...)

Administrator for the Third Judicial District.[5]  McNeil was on the Personnel Committee of the Board, which was responsible for general personnel matters.[6]  McNeil knew Campbell through both her position as an employee of the Third Judicial District as well as her work with the Community Coalition.

McNeil met with Campbell and Barker about Campbell's complaints.  Campbell reported that one of her concerns was that she was being ordered to keep track of her files in a way that would compromise victim safety.  Campbell also reported her concerns that male employees were treated differently than female employees.  McNeil believed the complaints were sufficient to warrant an investigation by the Board.  McNeil called Hall in order to find out what the correct procedure was for Campbell to have her complaints addressed.  Hall, who reported to the Board, responded, "Deb knows the procedure."  In her meeting with McNeil, Campbell discovered that an anonymous letter criticizing Hall had been sent to the Board earlier in the fall.[7]  Hall believed that Campbell authored the anonymous letter. McNeil directed Campbell to file grievances regarding what was happening to her which would then require Hall to inform the Board.  Campbell, however, held off filing grievances at that time, hoping the problems could be worked out.

---

[4](...continued)
American Federation of State, County, and Municipal Employees Union.

[5]The Board has a judicially appointed position, and McNeil held that position for approximately twenty years until leaving the Board in 2008.

[6]McNeil kept a file of matters referred to her as part of her duties on the Personnel Committee.  McNeil had received a copy of a letter from Myrah Favors complaining about harassment from Steve Middleton, her supervisor in the Third Judicial District.

[7]The anonymous letter is not part of the summary judgment record.

Campbell considered the "main duty" of her position  as bringing everyone in the community together on the issue of domestic violence.  Campbell was the chairperson of the Community Coalition.  At Community Coalition meetings, Campbell complained about the Third Judicial District's change in policies to the BEP, which she believed impacted victim safety.  In raising her concerns, Campbell believes she was doing so in her capacity as a private citizen.  Defendants contend that Campbell's discussions with the Community Coalition were in her official capacity.

On December 5, 2006, Campbell believed that Hall was staring at her in a hostile fashion, so she approached him and told him that she was aware of the anonymous letter sent to the Board.  Based on Campbell's perception of Hall's behavior toward her, she asked Hall if he thought she wrote the anonymous letter.  Campbell told him that while she had been coming to him regarding issues, she did not write the letter.   Concerned about poor morale in the office, Campbell and five co-employees signed an undated letter seeking to meet with Hall regarding office morale and related issues.  On December 6, 2006, the letter was put in Hall's mailbox.

On December 7, 2006, Hall told Campbell that he wanted to talk to her in his office.  Hall met privately with Campbell.[8]  Campbell alleges that, during this meeting, Hall accused her of being underhanded, a character assassin, an instigator, a liar, and a troublemaker.[9]   Campbell told Hall that she had been coming to him all along and again

---

[8]Campbell contends that she, alone, among the five signatories to the December 6, 2006, morale letter was singled out by Hall.  Defendants dispute this assertion and allege that Hall spoke separately to each of the five employees who signed the December 6, 2006, letter.

[9]Defendants deny that Hall called Campbell any of these names during the meeting.
(continued…)

told him she had not written the anonymous letter.  Hall told Campbell that all of the supervisors had issues with how she was doing her job.  Campbell interpreted Hall's statement to be a direct threat to her job.  Hall told Campbell that she needed to stay out of what was going on in the building and had better watch how she did her job.  During this same meeting, Campbell alleges Hall stated, "[Y]ou're old, you don't like change." Campbell Dep. at 101-102; Defendants' App. at 9-10.[10]

On December 12, 2006, Campbell went under a doctor's care and was put on medication due to workplace issues.  On December 19, 2006, she e-mailed Hall and Borg concerning their behavior toward her.  Campbell received no response.  On January 2, 2007, Campbell wrote to the Personnel Committee of the Board for a meeting.   In her letter, Campbell explained:

> I am requesting a meeting to discuss current office issues at the Dept. of Corrections.
>
> I have tried to resolve several work-related issues and instead of helping it has led to a hostile work environment which has affected my health.  Five of us wrote and asked Mr. Hall if he would meet with us to discuss office morale/issues.  Mr. Hall chose to single me out and accused me of writing an anonymous letter, of being a trouble maker, of being a character assassinator, of being older and not liking change, and he ended with:  "you know, Tom, Steve, and Karen all

---

[9](...continued)
Hall admits telling Campbell that whoever wrote the anonymous letter was guilty of character assassination.

[10]Hall contends he stated, "sometimes as we age, change becomes more difficult. . ."  Hall Dep. at 111-12; Defendants' App. at 60.

have concerns with how you're doing your job" which I consider a direct threat to my employment.

Attached please find a copy of an e-mail dated 12-19-06 that was addressed to Karen Borg with a copy sent to Linn Hall. To date I have not heard back from either one of them. It is difficult to represent the Dept. in the community with the treatment I am receiving in the office.

I would appreciate any assistance you can provide to help get this resolved.

Campbell Letter at 1, Plaintiff's App. at 084.

Hall turned the purpose of the meeting Campbell requested around so that it was about Campbell's performance issues. The day Hall found out that Campbell had written to the Personnel Committee, he set up the first of three meetings with Borg, Campbell, and Barker to discuss Campbell's progress on the changes she had been ordered to make to her program. On January 8, 2007, and again on January 22, 2007, and February 21, 2007, Hall, Borg, and Barker met with Campbell to discuss work issues.[11]

On January 31, 2007, at a meeting of the Personnel Committee, Campbell reported that Hall had made discriminatory comments toward her based on her age. Campbell also reported that Hall and Borg were retaliating against her. At a meeting of the Personnel Committee on February 9, 2007, Hall was upset that the Personnel Committee was involved in reviewing the complaints that had been made against him.

---

[11]Campbell alleges that Hall brought up her age at each of these meetings. Defendants deny that Hall made any reference to Campbell's age at the first two meetings. At the third meeting, defendants contend Hall brought up the subject of age only to refute attributions made against him by Campbell.

On February 21, 2007, Campbell requested a second meeting with the Personnel Committee of the Board to try and resolve certain issues, writing:

> I am requesting a second meeting to discuss ongoing office issues. I have met three times with Linn Hall, Karen Borg, and Paula Parker. The third meeting was held this morning and I related how my job has been affected by the changes over the last 6+ months. Linn took issue when I informed him that Briar Cliff University had removed Corrections from their intern placement catalog. He asked what I was "telling these people?" I told him that Briar Cliff took issue with the fact that their intern could not be in the building unless I was here, and that no one else could supervise her for me when I was gone. He stated that was not true, that I could have contacted Karen for help. After reminding him that I had come to him at least twice previously about this it was clear that he was trying to change the history of this issue. After the meeting I put an e-mail in his mail box with the last directive that Karen had given me on the intern issue: see attachment.
>
> At the second meeting we had, Karen brought up documenting phone calls. Due to the large caseload I explained about some of the nonsense calls I receive; she stated that it was important that I document them anyway. Linn stated at that meeting that I had been doing this job for 12 years and that he thought I could use discretion on what I recorded. Last week I met with Karen and showed her samples of the calls that come in that I do not record; she informed me to document them. At today's meeting Linn agreed with her. I have checked with other co-workers and they have not been told to document every call: what happened today I consider harassment and "payback."
>
> I feel I am being targeted and caught in a no-win situation. I have to continue to cover my back with management, and come up with "proof" after I am told one thing and then later

14

being told I was never told that to begin with.  This continues
to be a very stressful situation for me.

I will be gone from March 7th until the 19th so hopefully we
can meet either before that or after.

Campbell letter at 1; Plaintiff's App. at 093.

Campbell and Barker met with the Personnel Committee on March 21, 2007.  Hall
was also at the meeting.  At the meeting, Campbell complained about retaliation that had
occurred against her and Barker described the "good old boy" network in place at the
Third Judicial District.  Hall denied that he was retaliating against Campbell.  Hall told the
Personnel Committee that they were acting outside of their responsibilities in responding
to Campbell's complaints.  McNeil suggested to the rest of the committee that Campbell
be given an extension of time to appeal her grievances to the entire Board because Hall had
not previously given any guidance to McNeil or Campbell on how to address these issues.

Campbell met with the Personnel Committee once again on March 26, 2007.  The
Personnel Committee indicated that it would meet with Campbell again on September 7,
2007.  Also on March 26th, concerned about the complaints they had received regarding
Hall, the Personnel Committee wrote a letter to Hall demanding that he perform a written
survey of personnel and provide the Personnel Committee with the results, as well as an
action plan to address the areas of concern that had been directed to them.

On April 20, 2007, Borg accused Campbell of being a liar regarding her working
hours on a particular day.  Campbell later found what she believed to be proof that she had
not put down false information on her timesheet and went to Borg's office to tell her about
this information.  Campbell alleges that Borg again called her a liar.  Defendants contend
that Campbell called Borg a "fucking liar" twice during this meeting.  Campbell denies
calling Borg a "fucking liar," but admits she said, "I've fucking had it," to Borg, asked

15

for a new supervisor, and left Borg's office.  Following this meeting, Campbell contends that, due to directives from Hall and Borg, she was no longer allowed to perform work or attend meetings after normal working hours.  Defendants allege that  it was, at least in part, Campbell's decision to no longer attend meetings after hours.

On April 26, 2007, Campbell was issued a written reprimand by Borg.  Borg required all staff she supervised to let her know their schedules.  Borg accused Campbell of submitting an inaccurate timesheet and not reporting her work schedule ("the timesheet incident").  Campbell denied the allegation.  Borg supported the timesheet discipline with computer records indicating what time Campbell's computer was turned on and off as well as statements from two staff members indicating that they did not observe Campbell at the Third Judicial District facility when they left work.  Also on April 26th, Campbell was disciplined for allegedly calling Borg a "fucking liar" twice while the two were discussing Campbell's timesheet.  Campbell was suspended one day without pay ("the comment incident"). Hall stated that he had overheard Campbell use the "F word" while in his office.  Campbell contends that this was physically impossible for him to do because the incident took place in Borg's office, located in a different wing of the building than Hall's office.

On May 6, 2007, Campbell sent another letter to the Personnel Committee requesting their advice on how to deal with the ongoing issues until the September Personnel Committee meeting.  Campbell wrote:

> I am now asking what I should do between now and then with the increased hostility and harassment that is being directed toward me.  I am in fear every morning when I go to work wondering what is going to be used against me next.

16

Accusations against me continue.  When I have been accused of lying I have been able to prove that it is management that was untruthful which only seems to have stepped up the harassment.  The most recent is that I was accused of lying on my time sheet and what time I came in on a certain date.  When I found proof of what time I had come in, as I had stated, Linn Hall would not allow our computer tech to print it off for me.  I then went to my supervisor, Karen Borg, who proceeded to snap her fingers, ordered me into her office and treated me like a dog.  The hostility was unbearable and I said, "I've fucking had it" and walked out.  After being pushed into a corner time after time I acted out in a manner that is totally out of character for me.

Since then I have been accused by Karen Borg of saying that I called her a "f-ing liar".  And Linn Hall has signed a statement that he witnessed it, which is highly unlikely since he was not observed in the area.  A worker directly across the hall from where this happened tried to hear what was going on and could not.  I have been given two written reprimands and have been suspended one day without pay —5-4-07.

Weeks ago I e-mailed Linn asking for a different supervisor and there has been no response.  I have e-mailed Karen Borg asking if I was to use the computer as a time clock since that is what they are basing their time sheet issue on, and there has been no response.  I have been taken off of Comprehensive Strategy meetings, the Infant Mortality Review Team, and other community work that is directly related to my job, since I have now been ordered to work from 8 to 4:30.

In your letter dated 3-26-07 you asked me to use my skill and expertise and work with management, my question to you is, "how do I do that?"  My ability to do so is compromised by management.  What is your recommendation to resolve this?  There is no trust left, only fear — I am afraid of both Linn

> Hall and Karen Borg.  I don't believe that Karen Borg would
> be able to treat me this way without Linn's support/approval.

Campbell letter at 1; Plaintiff's App. at 104.  Campbell received no response to her letter.

On May 15, 2007, Borg gave Campbell a less than favorable evaluation.  This was Campbell's first negative evaluation after many years of positive evaluations.  Campbell responded to this with an addendum for her employee file.

On May 8, 2007, Campbell filed a union grievance to the timesheet incident, grievance #68563, and the comment incident, grievance #68567.  On May 29, 2007, Campbell faxed a note to McNeil indicating that, after consulting with Barker, she was unable to file a general office grievance, so Campbell was waiting for further direction.  She also mentioned that she had recently received a negative job evaluation from management.

On June 1, 2007, during a meeting of the full Board, it was decided, over McNeil's objection, that the investigation of the personnel matter involving Campbell should be turned back over to Hall.  McNeil believed that Hall had not established a good track record of being able to deal with the issues.  On June 6, 2007, Hall sent a letter to the Personnel Committee objecting to their involvement in the Campbell matter.  On June 8, 2007, McNeil discovered that Hall had destroyed the survey responses from staff that had been ordered by the Personnel Committee.  McNeil sent a letter to the Personnel Committee on June 11, 2007, indicating that she believed that this destruction of records was improper, if not illegal.  McNeil proceeded to send a letter to the full Board advising them of Hall's destruction of records but did not get a response from anyone else on the Board.

On June 29, 2007, Campbell filed fourteen personnel grievances alleging, *inter alia*, age discrimination and retaliation by placing them on Borg's desk.  Campbell felt her

18

disciplinary reprimand for the timesheet incident had to do with her age and gender. Campbell, however, could not state a specific example of someone younger than 40 years old who was treated differently.   On July 2, 2007, Campbell filed 8 more personnel grievances alleging, *inter alia*, sex discrimination and retaliation by placing them on Borg's desk.[12]   Campbell then took copies of her grievances to McNeil.  Campbell did so

---

[12]Campbell states in "Grievance #8" that:

> For years I have witnessed other females being targeted and subjected to a hostile work environment.  One co-worker was being harassed by a supervisor and it took her attorney husband stepping in before she was assigned a different supervisor;  she transferred to a different office.  I watched a secretary, harassed by this same supervisor, become a shattered woman who had to quit in order to protect her emotional/physical health.   (She will come forward upon request by the board.)  I watched as another secretary went through hell, again, same supervisor, and she had to quit as she could no longer handle the bullying and harassment. Attached is a letter from this former employee.

> I am now being subjected to the same patterns that have been in place for years against female employees (see letter/e-mails from my former supervisor, Jeff Page).  The stress is affecting both my emotional and physical health.

> I now understand why the former women did not file grievances.   The office policy states we are to ask for a grievance from the Personnel Dept. (Sandee Callaghan) where even a request would be shared with Linn Hall.  I decided it was time to file a grievance last week;  I asked Paula Barker if she would go to Sandee Callaghan to get one for me; see attached; there is no office grievance form. . . .

(continued…)

because she believed that the Board would not otherwise know about her grievances.

On July 2, 2007, the grievances for the timesheet and comment incidents were combined and settled. The final resolution was a reprimand without any suspension without pay.[13] On July 9, 2007, Borg issued Campbell a notice of disciplinary action for sending an e-mail to an assistant county attorney.[14] Campbell had developed a protocol

---

[12](…continued)
> (Note: the last 4 hired in the office have been 4 white males).

Grievance at 1, Defendants' App. at 155.

[13]The written settlement of the grievances stated:

> The resolution of the above noted Grievances is to mutually agree that all incidents leading to both reprimands be combined as one matter of discipline, that being a written reprimand which supercedes the previously imposed discipline of suspension without pay; said loss of pay shall be reimbursed to the grievant.

Settlement of grievances at 1; Defendants' App. at 85. The document was signed by Hall and Barker, as a representative of the American Federation of State, County and Municipal Employees Union ("AFSCME"), on July 2, 2007. Campbell did not sign the document.

[14]On June 7, 2007, Campbell received an e-mail from Jayme Kirsch, an Assistant Woodbury County Attorney, asking:

> Why are we getting all the "bs" in your reports? The Judge does not want to read about phone calls and who said what. Your chronology is critical to these cases, if they are not brief and to the point they are no good to us.
>
> I do not mean to be critical, you always to [sic] a good job, but

(continued…)

for dealing with county attorneys and judges.  Campbell tried to explain to Borg how this protocol had been developed at the request of the county attorneys and judges, and had been working for years.  Borg ordered changes be made to the protocol anyway, causing problems for the assistant county attorney who was involved in the e-mail exchange with Campbell.  Campbell's response to the assistant county attorney mentioned the new protocol she had been given.  Borg deemed Campbell's e-mail to be an act of insubordination because she considered it to be contrary to the Third Judicial District's conduct code.  Borg believed Campbell's e-mail included collateral notes that Campbell had been instructed to not include in her reports.  Campbell was disciplined with a two-day suspension without pay.

Borg felt Campbell had disrespected her on another occasion.  Borg felt Campbell was being insubordinate by hesitating to implement required procedures.  Specifically, Borg felt Campbell was trying to block the Third Judicial District's administration of the BEP.  Campbell denies that she was attempting to block the Third Judicial District's administration of the BEP, but admits to being concerned that victim safety was being compromised.  The parties dispute whether Borg treated Campbell the same as other employees under her supervision.

---

[14](...continued)
> the fluff needs to go.

Kirsch e-mail at 1; Defendants' App. at 94.  Campbell sent the following response:

> Sorry, I have been ordered to record all phone calls, etc. no matter how trivial;  I have tried explaining how and why these history's [sic] were set up(for our community response model) but management has not been supportive of our efforts.

Campbell e-mail at 1; Defendants' App. at 94.

On July 9, 2007, Campbell filed a union grievance over the two-day suspension (grievance #68566). On October 4, 2007, her grievance was denied without going through arbitration. Campbell admitted she probably could have phrased her e-mail response to the assistant county attorney differently and without criticizing the Third Judicial District's management for not being supportive.

Based on the recommendation of Dan Craig from the Iowa Department of Corrections, the Campbell matter was withdrawn from the purview of the Personnel Committee and turned over to the full Board. On July 13, 2007, Campbell's doctor put her on immediate medical leave and she was off work for several weeks. On September 7, 2007, Campbell attended a Board meeting. She had been led to believe that she would get some relief or a resolution at the meeting. Campbell, however, was told that the Board knew nothing about the issues she had presented. Campbell believed that Hall was supposed to have had her grievances on the agenda for the September 7th meeting but he had not placed them on the agenda. Hall only let the Board know about Campbell's grievances after she brought them up in the meeting. At the meeting, Campbell requested a different supervisor. Hall denied her request. McNeil called for a "truce" between Hall and Campbell until the next meeting. Hall responded, "'No, because she may do something we need to reprimand her for.'" Campbell Aff. at ¶ 19; Plaintiff's App. at 008. Campbell returned to work on September 10, 2007, after being off since July 13, 2007.

Campbell contends that Hall and Borg increased their scrutiny and micromanaging of her after she returned to work. She felt increased hostility in the workplace. Campbell further alleges that Borg and Hall would not speak to her, but would glare at her in the hallways and the men who were part of Hall's morning coffee klatch would no longer talk

to her.[15]   Campbell avers she was subjected to the following scrutiny and micromanagement after her complaints:

> During the months of hostility and demeaning behavior I was subjected to: Supervisor Borg ordering me to report to her every time I left the building; others did not have to do this. She sent me an e-mail berating me for not letting her know my schedule when I had. She ordered me to work with my door open when others did not have to. She ordered me to record every phone call, no matter how trivial, and others did not have to do this. She cut me off from important community involvements that she did not deem relevant to my job, but she had never asked me about my position, other than paperwork issues. She slashed paperwork that was done correctly and made me redo it. Supervisor Borg blamed me for her mistakes when she wrongly informed someone on a BEP issue. Supervisor Borg called me at home twice in one day when I called in sick, to check if I was there. She ordered me to bring in a doctor's note after two days when other workers could be gone a week without a doctor's note. I had ordered office supplies and after weeks had not received then [sic], only to be told by management that I would need a requisition form when no other coworkers had to have a requisition form. In fact there was no requisition form-see attached Affidavit Exhibit 3-this was sent weeks after my request for supplies. My flex schedule was taken from me so that I could no longer do some of my job duties. I was blamed for changes in court notes/chronologies when the changes were made when I was on medical leave. I was no longer able to access some of my records as Supervisor Borg removed them from my computer and only she and Middleton had access to them. I was given conflicting directives and was lied to about my records.

---

[15] Defendants deny Hall was angry with Campbell and Hall could not recall if he ever stared at her.

Campbell Aff. at ¶ 21; Plaintiff's App. at 009.  Defendants dispute Campbell's assertions and allege that she was treated no differently than any other employee supervised by Borg.

Hall denied Campbell's grievances, in part on the grounds that the grievances were untimely.  When McNeil learned this, it indicated to her that Hall had denied the extension of time for Campbell that McNeil had previously suggested.  The Board did not conduct their own investigation.  Instead, an investigation of Campbell's grievances was conducted by investigators from the Iowa Department of Corrections.   On October 10, 2007, two investigators from the Department of Corrections interviewed workers about what was occurring in the Third Judicial District.  Hall made a series of negative comments about Campbell's work performance to the investigators.  His comments to the investigators included allegations that Campbell did not want to make the changes being asked of her and that he believed they were correct in disciplining her.  During the recorded interviews, the investigators were told there was a "good old boy" system in place and that women were targeted and run out.  The investigators were also informed that retaliation was the norm for Hall if he was crossed in any way.  In addition, the investigators were told that management was bullying, belittling, hostile, inflexible, and made life miserable for some workers.  They were also informed that morale was low in the office and people were afraid of losing their jobs.  Barker told the investigators that she had noticed a pattern of employee bullying by Hall to the point that employees had been forced to quit or had been terminated.  Barker observed that all of the employees who had been bullied had been female and she had not seen any male employees treated in the same fashion as the women who were bullied.  Barker also told the investigators that Campbell was being bullied and reported that Hall and management demanded that Campbell document every contact she had with others including telephone calls which no other Third Judicial District employee

was required to do.  Barker further told the investigators that Hall's and management's bullying and micromanagement of Campbell had "gotten really bad" after she filed grievances against Hall.

Debra McAllister was also interviewed as part of the investigation.  McAllister has been a secretary with the Third Judicial District for twenty years.  She reported witnessing a pattern of discrimination against females in the Third Judicial District over the past several years.  McAllister informed the investigators that Mary Moreno and Jan Widman had been forced out of their jobs through bullying and micromanagement by their supervisor Middleton.  She further reported that this pattern of behavior was accepted by Hall.  She further told them that Campbell was the latest in a line of women who had been mistreated in this fashion and had seen the physical effects that the mistreatment had on Campbell's health.  She informed the investigators that management demanded changes to Campbell's program without notice, compromise, or consultation with Campbell. McAllister also reported that the nitpicking of Campbell's work began after Campbell objected to management's changes because she thought they compromised safety and confidentiality.  McAllister had observed that, after Campbell's complaints, Campbell was under constant scrutiny, with someone watching when she came to work, went to lunch, and when she left work.  She also reported that while Borg was responsible for much of the bullying against Campbell, McAllister believed that Borg was doing this at Hall's direction and in an attempt to fit in with the Third Judicial District's "good old boy" network.  McAllister further reported that no male employees had been singled out for such treatment by Third Judicial District supervisors.

On November 20, 2007, a report was issued on the investigation.  The report did not mention Campbell's complaints about the different treatment of men and women in the

Third Judicial District, or that female co-workers had experienced bullying and intimidation by management.   The investigation concluded with "the investigators find[ing] that Deb's complaints are not supported by the evidence obtained." Defendants' Ex. 4, Defendants' App. at 162.  On February 1, 2008, the Board accepted the conclusion of the investigation and approved the denial of Campbell's grievances.

The stress of the working environment took its toll on Campbell.  She missed work frequently.  After returning to work for only a short time at the end of 2007, she was off work all of January 2008, and part of February 2008.  She returned to work shortly before she was terminated on February 28, 2008.

When Campbell returned to work in February 2008, she discovered that Borg had sent a letter to a dangerous offender while Campbell was on leave and had put Campbell's name on it.  The offender responded with a threatening letter addressed to Campbell.  Borg did not tell Campbell about this incident.  Campbell only learned of the incident when she saw the file had a notation that "a threatening letter was received."  Campbell told investigators who came in February 2008 about this incident, but they did not include it in their report.

Another incident occurred in February 2008, when Campbell was informed by management that she could no longer send reports to another community system regarding offenders and victim safety.  Campbell contacted Des Moines for clarification and was told that by not providing this information the Third Judicial District "'actually jeopardizes the danger to or safety of an individual.'"  Campbell Aff. at ¶ 27; Plaintiff's App. at 012 (quoting Plaintiff's Ex. 6 at 2; Plaintiff's App. at 026).  Campbell notified management of this fact, but was told not to send the reports.

On February 28, 2008, Campbell received a notice of disciplinary action "for [Campbell's] continued acts of insubordination by not following directives from your supervisor and for removing and/or altering the court notes in offender files without prior approval from your supervisor." Defendants' Ex. D at 117; Defendants' App. at 99. The disciplinary action resulted from an investigation by the Iowa Department of Corrections ("the altered court notes incident"). Campbell denies that she altered court notes. Campbell's employment with the Third Judicial District was terminated on the same day. Hall approved Borg's recommendation that Campbell be fired. Borg was 42 years old at the time Campbell was terminated. Campbell's termination happened without the Board's involvement. Shortly after Campbell's termination, Hall went to McNeil and told her that she should remove herself from the Board because she was not objective.

Campbell filed a union grievance (grievance #80815) claiming that "[o]n 2-28-08 [she] was terminated without just cause." Defendants' Ex. D at 572; Defendants' App. at 102. On March 24, 2008, Campbell's grievance #80815 was settled.[16] Campbell's

_____

[16]The "Grievance Settlement Agreement" stated:

> The State of Iowa Department of Correctional Services, Third Judicial District, hereinafter "State", and AFSCME/Iowa Council 61, hereinafter "Union," enter into the following Settlement Agreement in full and final resolution of the grievance filed on behalf of Deb Campbell, hereinafter "Grievant", AFSCME grievance number 80815 alleging a violation of Article IV, Section 9, of the 2007-2009 Collective Bargaining Agreement between the parties.
>
> This settlement arose out of a situation involving the Grievant's termination of employment. As a result the parties

(continued...)

[16](...continued)
have agreed to the following in a good faith effort to settle the issues of the above stated grievance.

1) The Grievant agrees to resign from the position of Community Program Monitor with the Department of Correctional Services, Third Judicial District, effective February 28, 2008.

2) The State agrees that the letter of termination issued to the Grievant on February 28, 2008, shall be removed from the Grievant's personnel file and replaced with the above stated resignation.

3) The State agrees not to challenge the Grievant's claim for Unemployment Benefits.

4) Furthermore, the parties agree to refrain from any libelous, slanderous, or otherwise unlawful statements directed at or about the other party.

5) In consideration of the foregoing, the Union agrees to withdraw the above stated grievance.

6) This Settlement Agreement is a good-faith settlement of the above stated grievance arising from the claims alleged therein.   No promises for any other consideration have been made by anyone.  The above consideration is all that will be received for the Grievant's claims in this grievance as same pertain to the State of Iowa.  Neither party shall rely upon or cite the terms and conditions of this agreement in any current or subsequent dispute between the parties, except for cases directly concerning the Grievant.

(continued...)

28

letter of termination was removed, and Campbell was permitted to resign.  The Third Judicial District also agreed not to challenge Campbell's request for unemployment benefits.  Campbell thought that age or gender discrimination played a role in the disciplinary action taken against her.  However, when asked if the Iowa Department of Corrections employees who conducted the investigation of "the altered court notes incident" were motivated by Campbell's age or gender, Campbell replied, "I have no idea."  Campbell's Dep. at 155; Defendants' App. at 19.

Campbell does not think Hall singled out all females at the Third Judicial District for discrimination.  She further concedes that she never heard Hall or Borg say anything specifically discriminatory about women to her and had promoted females, including Borg, who were over 40 years old at the time of their promotion.  Campbell, however, knew of female employees afraid to speak to Hall but did not know of any males afraid to speak to him.  Campbell witnessed males, but not females, go to Hall's office and stand in the doorway and talk to him.  There were men in the Third Judicial District who would have coffee in the morning and take extended lunches, but were never accused of lying on their timesheets or reprimanded.  Regarding swearing in the office, one male worker, Craig Hartman, used the "f word" frequently but was never disciplined for his behavior.[17]  Male staff members had been disciplined for being arrested for operating a motor vehicle while

---

[16](...continued)

Grievance Settlement Agreement at 1, Defendants' App. at 103.  The settlement agreement was signed by Hall, Campbell, and Preston DeBoer, as representative of the AFSCME.

[17]Although defendants concede that Hartman was never disciplined for using inappropriate language in the office, defendants assert that Hartman's supervisors did speak to him about his language.

intoxicated.  Some males were permitted to participate in non-work related events during the day because of their flex hour schedule.

Campbell believes she was subjected to retaliation after voicing her objections to management by false disciplinary actions, micromanagement, and bullying.  Campbell believes that the conflict over victim information confidentiality in the Third Judicial District records was a motivating factor for Hall's maltreatment of her.  Defendants dispute these factual assertions.

Two separate investigations conducted by different Department of Corrections investigators, and not the Third Judicial District, concluded:  (1) on November 27, 2007, there was no sex or gender discrimination, nor retaliation against Campbell; and (2) on February 25, 2008, Campbell had been insubordinate in her e-mails and had altered court notes without Borg's approval and that these actions had led to her resignation.

Since Campbell's termination, four individuals have been hired to fill her position. The first person, "Jennica", was 27 years old at the time of Campbell's termination.  Next was "Matt", who was 30 years old at the time he was hired.  The third person hired was "Shelly", who was 24 years old at the time of her hiring.  A fourth person was also hired to fill the position.  This fourth person was under the age of 40 at the time of hiring.

## II.  LEGAL ANALYSIS

### A.  Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary

judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the

district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*,

129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*).

The Eighth Circuit Court of Appeals recognized in a number of panel decisions that summary judgment is "disfavored" or should be used "sparingly" in employment discrimination cases. *See id.*, at 1043 (collecting such cases in an Appendix). The rationales for this "employment discrimination exception" were that "discrimination cases often turn on inferences rather than on direct evidence. . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and that "intent" is generally a central issue in employment discrimination cases. *See, e.g., Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). On the other hand, the Supreme Court recognized that, even in employment discrimination cases, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In its *en banc* decision in *Torgerson*, the Eighth Circuit Court of Appeals expressly rejected the notion that summary judgment in employment discrimination cases is considered under a separate standard, citing *Reeves* and *Celotex*. Instead, the court held as follows:

> Because summary judgment is not disfavored and is designed
> for "every action," panel statements to the contrary are
> unauthorized and should not be followed.   There is no
> "discrimination case exception" to the application of summary
> judgment, which is a useful pretrial tool to determine whether
> any case, including one alleging discrimination, merits a trial.

*Torgerson*, 643 F.3d at 1043.

Therefore, I will apply these standards to the defendants' Motion for Summary Judgment.

However, I must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task.  Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting.  Missing in the standard incantation of summary judgment principles is the role of experience.  Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881).   Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations.

Employment discrimination and retaliation, except in the rarest cases, is difficult to prove.  It is perhaps more difficult to prove today—more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA which are at issue here—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it.  *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987).   Indeed, the Fifth

Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.*

Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

### B.  *Effect of Settled Grievances*

Defendants initially assert that the settlement of grievances the AFSCME filed on Campbell's behalf, concerning three of the four formal disciplinary actions taken against her, bars any subsequent claims arising from the conduct at issue in those disciplinary actions.  Campbell argues the AFSCME had no authority to waive her individual rights under Title VII, the Iowa Civil Rights Act, the United States Constitution and the other laws on which she bases her causes of action.   Alternatively, Campbell argues that defendants' assertion that she waived her claims though resolution of the grievances filed on her behalf by the AFSCME should be rejected because there is no language in the agreement suggesting a waiver of claims or causes of action arising from the facts underlying the grievance.

It is well established that "[a] voluntary waiver of claims bars future action on [those] claims." *Littrell v. City of Kansas City,* 459 F.3d 918, 921 (8th Cir. 2006); *see Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 52 n.15 (1974); *Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681, 689-90 (8th Cir. 1998); *Pilon v. University of Minn.,* 710 F.2d 466, 468 (8th Cir. 1983).  In *Alexander,* the United States Supreme Court held that an employee did not waive Title VII rights by initially submitting a discrimination claim to arbitration pursuant to a collective bargaining agreement.  The Court recognized, however, that it is possible for an employee to waive a cause of action under Title VII pursuant to a voluntary settlement.  *Alexander v. Gardner-Denver Co.,* 415 U.S. at 52.  In holding that there was no waiver, the Court observed that there was no settlement agreement "expressly conditioned on a waiver of the employee's cause of action under Title VII." *Id.* at 52 n. 15.  In addition, the Court cautioned that "[i]n determining the effectiveness of any such waiver, a court would have to determine at the outset that the

employee's consent was voluntary and knowing." *Id.* In considering whether a waiver of rights is knowing and voluntary, the Eighth Circuit Court of Appeals has looked to the following factors and principles of contract construction: (1) whether the release was supported by adequate consideration; (2) whether Campbell had access to counsel; (3) the clarity and lack of ambiguity of the release; (4) the length of time Campbell had to consider the release; (5) whether Campbell was able to negotiate any changes to the release; (6) the presence or absence of fraud, duress, or other inequitable conduct. *See Pilon,* 710 F.2d at 468; *Ulvin v. Northwestern Nat'l Life Ins. Co.*, 943 F.2d 862, 867 (8th Cir. 1991); *Lancaster v. Buerkle Buick Honda Co.,* 809 F.2d 539, 541 (8th Cir. 1987).

The "Grievance Settlement Agreement" stated:

> The State of Iowa Department of Correctional Services, Third Judicial District, hereinafter "State", and AFSCME/Iowa Council 61, hereinafter "Union," enter into the following Settlement Agreement in full and final resolution of the grievance filed on behalf of Deb Campbell, hereinafter "Grievant", AFSCME grievance number 80815 alleging a violation of Article IV, Section 9, of the 2007-2009 Collective Bargaining Agreement between the parties.
>
> This settlement arose out of situation involving the Grievant's termination of employment. As a result the parties have agreed to the following in a good faith effort to settle the issues of the above stated grievance.
>
> > 1) The Grievant agrees to resign from the position of Community Program Monitor with the Department of Correctional Services, Third Judicial District, effective February 28, 2008.
> >
> > 2) The State agrees that the letter of termination issued to the Grievant on February 28, 2008, shall be removed

> from the Grievant's personnel file and replaced with the above stated resignation.
>
> 3)   The State agrees not to challenge the Grievant's claim for Unemployment Benefits.
>
> 4)   Furthermore, the parties agree to refrain from any libelous, slanderous, or otherwise unlawful statements directed at or about the other party.
>
> 5)   In consideration of the foregoing, the Union agrees to withdraw the above stated grievance.
>
> 6) This Settlement Agreement is a good-faith settlement of the above stated grievance arising from the claims alleged therein.   No promises for any other consideration have been made by anyone.  The above consideration is all that will be received for the Grievant's claims in this grievance as same pertain to the State of Iowa.  Neither party shall rely upon or cite the terms and conditions of this agreement in any current or subsequent dispute between the parties, except for cases directly concerning the Grievant.

Grievance Settlement Agreement at 1, Defendants' App. at 103.

My application of factors mentioned above is hampered by the complete lack of facts in the summary judgement record concerning the execution of the Grievance Settlement Agreement.   On the limited record before me, application of these factors leads me to conclude that there is a material factual dispute as to whether Campbell knowingly waived her right to institute this lawsuit.  The Grievance Settlement Agreement does not state that Campbell relinquished her right to initiate any lawsuit.  Indeed, the Grievance Settlement Agreement does not even indicate that Campbell is a party to it.  The agreement expressly states that "[t]he State of Iowa Department of Correctional Services, Third

Judicial District, hereinafter "State", and AFSCME/Iowa Council 61, hereinafter "Union," enter into the following Settlement Agreement in full and final resolution of the grievance filed on behalf of Deb Campbell. . ." Grievance Settlement Agreement at 1, Defendants' App. at 103. If the defendants wanted to make sure that the Grievance Settlement Agreement would bar Campbell from bringing a lawsuit arising from the facts underlying her grievance, they could have made that crystal clear in the agreement. They did not. Moreover, there is nothing in the summary judgment record suggesting Campbell was represented by counsel at the time she signed the Grievance Settlement Agreement. Nor is there anything suggesting how long Campbell had access to the agreement before signing it or whether she was able to negotiate the addition of favorable terms to the Agreement. I am not unmindful that Campbell, an educated woman, signed the Grievance Settlement Agreement.[18] However, in the apt words of Judge Wisdom, "[t]o assume that, notwithstanding strong evidence to the contrary, a signature implies understanding is to allow a rule of contract law to play too salient a part in the administration of a remedial civil rights statute." *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1172 (5th Cir. 1976). Therefore, I decline to interpret the Grievance Settlement Agreement to include a waiver of Campbell's right to assert her claims here. At best, a genuine issue of material fact exists as to whether Campbell's signature on the Grievance Settlement Agreement constituted a waiver of her right to bring her claims. Thus, this portion of Defendants' Motion for Summary Judgement is denied.

---

[18]Unlike the Grievance Settlement Agreement, Campbell did not sign the July 2, 2007, agreement settling grievances #68563 and #68567.

### C.  Eleventh Amendment Immunity

I next take up defendants' argument that Eleventh Amendment immunity bars prosecution of Campbell's state law claims against the Third Judicial District.[19] Campbell concedes that the Eleventh Amendment bars her state claims against the Third Judicial

---

[19] The Eleventh Amendment to the United States Constitution provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

U. S. CONST. amend. XI.  The Eleventh Amendment, as interpreted by the Supreme Court, is a recognition of the "vital role of the doctrine of sovereign immunity in our federal system":

> A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued.  As Justice Marshall well has noted, "because of the problems of federalism inherent in making one sovereign appear against its will in the courts of the other, a restriction upon the exercise of federal judicial power has long been considered to be appropriate in a case such as this." *Employees v. Missouri Dept. of Public Health and Welfare*, 411 U.S. 279, 294 (1973) (concurring in result).  Accordingly, in deciding this case we must be guided by "[t]he principles of federalism that inform Eleventh Amendment doctrine." *Hutto v. Finney*, 437 U.S. 678, 691 (1978).

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984) (footnotes omitted; emphasis in the original).

District in federal court.[20]  *See Kane v. State of Iowa Dep't of Human Servs.,* 955 F. Supp. 1117, 1132 (N.D. Iowa 1997).  Campbell states she will try her state law claims in her pending state court case if defendants do not agree to trying those claims here.[21]  I find the Eleventh Amendment bars Campbell's pursuit of state law claims against the Third Judicial District in this federal court.  Defendants' Motion for Summary Judgment, as to Campbell's state law claims against the Third Judicial District, is therefore granted.[22]

---

[20]While an action for damages against Scholl in his official capacity is tantamount to a suit against the state of Iowa itself, *see Kentucky v. Graham,* 473 U.S. 159, 165 (1985), defendants concede that the Eleventh Amendment does not bar Campbell's ICRA claims against Scholl in his official capacity for injunctive relief.  *See Hopkins v. Saunders,* 199 F.3d 968, 977 (8th Cir. 1999) ("The Eleventh Amendment protects a state official sued in his official capacity from all claims except for certain forms of prospective equitable relief, such as reinstatement.") (citing *Campbell v. Arkansas Dep't of Correction,* 155 F.3d 950, 962 (8th Cir. 1998)); *see also  Thomas v. FAG Bearings Corp.,* 50 F.3d 502, 505 (8th Cir. 1995) (citing *Edelman v. Jordan,* 415 U.S. 651, 663-64 (1974)); *Glick v. Henderson*, 855 F.2d 536, 540 (8th Cir. 1988); *Casey v. Riedel*, 193 F. Supp.2d 1122, 1129 (S.D. Iowa 2002).

[21]Campbell states she also filed her state law claims in Iowa District Court for Woodbury County, *see Campbell v. State of Iowa Third Judicial District*, No. LACV141263 (Iowa D. Ct.), due to her concerns about Eleventh Amendment immunity.  Campbell's state case has been stayed pending the outcome here.

[22] The United States Supreme Court has held that "[e]ven a suit for money damages may be prosecuted against a state officer in his *individual* capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally." *Alden v. Maine,* 527 U.S. 706, 755 (1999) (emphasis added) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 237–38 (1974), and *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 462 (1945)).  Defendants have not sought summary judgment against Hall in his individual capacity because it was unclear from Campbell's original Complaint whether she was suing

(continued…)

### D.   Title VII Sexual Discrimination Claims

Defendants seek summary judgment on Campbell's sexual discrimination claims. Defendants concede, for the purposes of summary judgment, that Campbell can establish her *prima facie* case of sex discrimination.[23]   Defendants argue Campbell is unable to produce circumstantial evidence which could reasonably support an inference of sex

---

[22](...continued)
him in his individual capacity. In her Amended Complaint, Campbell has expressly sued Hall in his individual capacity. Therefore, Campbell's claims against Hall in his individual capacity are not presently before me for resolution on summary judgment.

[23]In considering Campbell's sexual discrimination claims, I will not distinguish between her claims under Title VII and comparable sexual discrimination claims under the ICRA. I have previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." *Soto v. John Morrell & Co.*, 285 F. Supp.2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)); *see King v. United States*, 553 F.3d 1156, 1160 n.3 (8th Cir. 2009) (noting that "[b]ecause the same analysis applies to age discrimination claims under the ADEA and the ICRA," the court need not discuss plaintiff's claims under ICRA); *Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1095 n.4 (8th Cir. 2007) (same); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n.2 (8th Cir. 2000) ("The ICRA is interpreted to mirror federal law, including the ADEA") (citing *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999)). This is because the Iowa Supreme Court has recognized federal precedent is applicable to discrimination claims under the ICRA. *See Soto*, 285 F. Supp.2d at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims. *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between the ADEA and the ICRA becomes critical, my analysis of Campbell's Title VII claims applies equally to her ICRA claims.

discrimination and, therefore, this portion of their Motion for Summary Judgment should be granted.

### 1. *Elements of disparate treatment claim*

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of . . . sex.*" 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Discrimination occurs when sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at § 2000e-2(m). Campbell agrees with defendants that the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), applies here. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253-55 (1981); *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802; *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011); *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 867 (8th Cir. 2009). If the plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253; *Jackson*, 643 F.3d at 1086; *Dixon*, 578 F.3d at 867 (8th Cir. 2009). If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Burdine,* 450 U.S. at 255 n.10. The burden then shifts back at the third and final stage to the plaintiff, who must show that the employer's proffered reason was merely a pretext for discrimination. *Id.* at 253; *Jackson*, 643 F.3d at 1086; *Dixon*, 578 F.3d at 867. The

ultimate burden remains with the plaintiff at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Burdine,* 450 U.S. at 253.

### 2. *Campbell's* **prima facie** *case*

In order to establish a *prima facie* case of discrimination, Campbell must show: "'(1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.'" *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009) (quoting *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008)); *Lewis*, 591 F.3d at 1038. "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets his burden of establishing a *prima facie* case of employment discrimination." *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1006 (8th Cir. 2005) (citing *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir. 1996)(in turn citing *Burdine*, 450 U.S. at 254).

Defendants do not contest that Campbell can establish a *prima facie* case of sex discrimination, for purposes of their summary judgment motion. Therefore, I find, for the purposes of this summary judgment motion, Campbell has established a presumption of discrimination, *see Pope*, 406 F.3d at 1006 (citations omitted), and I will move to the second stage of the *McDonnell Douglas* burden shifting analysis.

### 3.    *Defendants' legitimate, nondiscriminatory reason*

Once a plaintiff establishes a *prima facie* case under the *McDonnell Douglas* burden-shifting analysis, the burden[24] shifts to the employer to "'articulate [a] legitimate, nondiscriminatory reason'" for the adverse employment action. *Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 857 (8th Cir. 2008). "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Pope*, 406 F.3d at 1007 (citing *Floyd v. State of Mo. Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir.1999)). Once this burden has been met, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination. *Pope*, 406 F.3d at 1007 (citations omitted).

Defendants allege that Campbell was terminated for a variety of improper conduct. Campbell, although claiming these asserted reasons are pretext for unlawful discrimination, does not contest—at least Campbell does not seriously contest in her brief—that defendants have met their burden of production. Therefore, I find that defendants have met their burden of production for purposes of their summary judgment motion, and that Campbell has the burden, of production and persuasion, to identify a genuine issue of material fact concerning whether defendants' alleged reason for terminating her is pretext for unlawful discrimination. *See id.*

---

[24]This burden is one of production. *See Pope*, 406 F.3d at 1007. "At all times, the burden of persuasion remains with the plaintiff." *Id.* (citing *Gagnon v. Sprint Corp.*, 284 F.3d 839, 847 (8th Cir.2002)(in turn citing *St. Mary's*, 509 U.S. at 507).

### 4.     Pretext

There are a number of ways in which an employee can make a sufficient showing of pretext.  *See Arnold v. Nursing and Rehabilitation Center at Good Shepherd, L.L.C.*, 471 F.3d 843, 847 (8th Cir. 2006).  The Eighth Circuit Court of Appeals has explained:

> A plaintiff may make a sufficient showing of pretext by different means, including showing that an employer: (1) failed to follow its own policies, *Ledbetter v. Alltel Corporate Servs.*, Inc. 437 F.3d 717 (8th Cir.2006); (2) treated similarly-situated employees in a disparate manner, *Putman v. Unity Health Sys.*, 348 F.3d 732 (8th Cir.2003); and (3) made substantial changes over time in its proffered reason for an employment decision, *Kobrin v. Univ. of Minn.*, 34 F.3d 698 (8th Cir.1994), cert. denied, 522 U.S. 1113, 118 S. Ct. 1046, 140 L.Ed.2d 111 (1998).

*Id*.  In addition, a plaintiff may establish pretext by showing that the proffered explanation has no basis in fact.  *See Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 727 (8th Cir. 2001).  In addition, a plaintiff "can establish pretext by showing that it was unlikely [that] an employer would have acted on the basis of the proffered reason." *Id.*  Finally, evidence of a discriminatory attitude in the workplace "may also tend to show that the employer's proffered explanation for the action was not the true reason for the discharge." *Id.*

Campbell asserts that there was a pattern and practice within the Third Judicial District of treating women differently than male employees, and that she was the latest in a line of women who have been singled out for mistreatment and bullying by management, and she was ultimately terminated due to this difference in treatment.  Campbell claims that she can show defendants' asserted reason for terminating her was pretext for sex discrimination, based on the treatment she received as compared to similarly situated male employees.  At the pretext stage, "the test for determining whether [a male employee] is

similarly situated to [Campbell] is rigorous." *Wimbley*, 588 F.3d at 962 (citing *Rodgers*, 417 F.3d at 853). "To be probative evidence of pretext, the misconduct of the more leniently disciplined employees must be of comparable seriousness." *Id.* (quoting *Rogers*, 417 F.3d at 853). In fact, the employees must be similarly situated in "all relevant respects." *Id.* "To satisfy this standard, '[t]he individuals used as comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."'" *Rodgers*, 417 F.3d at 851 (quoting *Gilmore v. AT&T*, 319 F.3d 1042 (8th Cir. 2003) in turn quoting *Clark*, 218 F.3d at 918)). Under federal law, "an unlawful employment practice is established when a complaining party demonstrates that sex . . . was 'a motivating factor' for a discharge, even though other factors also motivated the discharge." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (2008) (citing 42 U.S.C. § 2000e-2(m); *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 435-36 (8th Cir.1998)). Under Iowa law, the plaintiff must show that "a prohibited criterion was a 'motivating factor' in the defendant's employment decision to establish a violation of the ICRA." *Gross v. FBL Fin. Servs., Inc.*, 588 F.3d 614, 618 (8th Cir. 2009) (citing *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1 (Iowa 2009)). A factor is a motivating factor under Iowa law if it "'played a part' in the employer's action. . . ." *Id.* (citing *Deboom*, 772 N.W.2d at 13).

Campbell claims that Craig Hartman is a similarly situated male employee who was not only never disciplined for using the "f word" frequently in the office, but was actually promoted, while she was disciplined for using it just one time. The parties dispute, however, whether there are "any mitigating or distinguishing circumstances" between Campbell's and Hartman's conduct. *See Rodgers*, 417 F.3d at 851 (citations omitted). Specifically, the parties dispute whether Campbell called Borg a "fucking liar" twice

during a meeting, as defendants allege, or whether Campbell stated, "I've fucking had it," to Borg, as Campbell asserts.   This dispute gives rise to genuine issues of material fact over whether Campbell and Hartman were similarly situated employees who were treated in a disparate manner.

Campbell also points out that she was singled out for disparate treatment by: (1) being ordered to report to management every time she left the building; (2) criticized when she did not report her schedule; (3) being ordered to work with the door to her office open; (4) being required to record every telephone call; (5) being called at home when she was off of work because of illness to verify that she was sick and being required to bring in a doctor's note following even a short illness; (6) being denied office supplies because she did not use the appropriate requisition form even though there was not such form; and (7) having her flex schedule taken away.   "Evidence that similarly situated employees outside Lewis' class were treated differently is only '[o]ne common way to show pretext [.]'" *Lewis*, 591 F.3d at 1041 (quoting *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 868 (8th Cir. 2005)).

On the summary judgment record here, a reasonable factfinder could disbelieve defendants' proffered reason for firing Campbell.   Defendants asserts that Campbell was fired, *inter alia*, because she altered court notes.   Campbell denies altering any court notes and argues that she was out of the office on medical leave when the alterations occurred. She contends that evidence suggests the Borg herself altered the notes and attributed the changes to Campbell.   Campbell argues that a reasonable factfinder could infer from this that the court note alterations were manufactured by the defendants in order to fire her. In a motion for summary judgment, these facts must be considered in the light most favorable to the non-moving party. The totality of all these actions could be found by the

trier of fact to be sufficient to conclude that defendants' alleged reason for Campbell's termination was pretext for unlawful discrimination. *See Lewis,* 591 F.3d at 1042 ("At [the summary judgment] stage of the case, the question is not whether [the plaintiff] will prevail on her claim but rather whether she has offered sufficient evidence from which a reasonable factfinder could find that she was discriminated against because of her sex."). I conclude that Campbell has generated genuine issues of material fact that defendants' proffered reasons for her termination were merely a pretext for sexual discrimination. Thus, this portion of defendants' Motion for Summary Judgment is also denied.

### E. Retaliation

Campbell also claims she was the victim of retaliation for filing grievances alleging sexual discrimination. Defendants also move for summary judgment on this claim.

In addition to its prohibitions on sexually discriminatory treatment and the creation of a sexually hostile work environment, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see Young-Losee v. Graphic Packaging Int'l, Inc.* 631 F.3d 909, 911-12 (8th Cir. 2011). On the other hand, "'[f]iling a complaint [of discrimination] does not clothe [the plaintiff] with immunity for past and present inadequacies.'" *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (quoting *Calder v. TCI Cablevision of Mo.*, 298 F.3d 723, 731 (8th Cir. 2002), with internal quotations in *Calder* omitted). "'To defeat summary judgment, a plaintiff must produce either direct evidence of discrimination or create an inference of it under the *McDonnell*

*Douglas* burden-shifting framework.'" *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011) (quoting *Young-Losee,* 631 F.3d at 911-12); *see Gallagher v. Magner,* 619 F.3d 823, 831 (8th Cir. 2010). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Young-Losee,* 631 F.3d at 912 (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 68 (2006)). "'Direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.* (quoting *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir. 2004)). "If a plaintiff produces direct evidence, evidence of the employer's motives for a termination is an issue for trial, not summary judgment." *Id.*; *see Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1046 (8th Cir. 2005). When, as here, plaintiff presents "no direct evidence of retaliation, [the court will] analyze [the] claim pursuant to the *McDonnell Douglas* burden-shifting analysis." *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007).

### 1.   *Campbell's* **prima facie** *case*

To establish a *prima facie* case of retaliation under Title VII, Campbell must demonstrate the following:  (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action.  *See Helton v. Southland Racing Corp.,* 600 F.3d 954, 960 (8th Cir. 2010); *Hervey v. County of Koochiching*, 527 F.3d 711, (8th Cir. 722 (8th Cir. 2008); *Wegner v. City of Ladue*, 500 F.3d 710, 726 (8th cir. 2007); *Wells*, 469 F.3d at 702; *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006).  Again, defendants do not contest that Campbell can establish a *prima facie* case of retaliation, for purposes of their summary judgment motion.  Therefore, I

find, for the purposes of this summary judgment motion, Campbell has established a presumption of retaliation, and I will move to the second stage of the *McDonnell Douglas* burden shifting analysis.

### 2.      Defendants' legitimate, nondiscriminatory reason

Having found that Campbell has established a *prima facie* case of retaliation, her claim may still fail if defendants produce, and Campbell fails to rebut, a legitimate, non-discriminatory reason for the allegedly retaliatory action. *See Thomas*, 483 F.3d at 531 ("But even if [the plaintiff] established a prima facie case, the defendants offered legitimate reasons for terminating [the plaintiff], which [the plaintiff] fails to rebut with evidence of pretext.   Summary judgment in the defendants' favor is [therefore] proper on [the plaintiff's] retaliation claim.").   Defendants have offered a legitimate, non-retaliatory reason for terminating Campbell's employment, that she was fired for improper conduct, altering court notes.   Campbell, although arguing defendants' asserted reason is a pretext for unlawful retaliation, does not contest for the purposes of summary judgment that defendants have met their burden of production.   Therefore, because the parties do not dispute that Campbell has established a *prima facie* case of retaliation and that defendants have, in turn, produced evidence that the questioned employment decision was made for a legitimate, non-discriminatory reason, I need only consider whether Campbell has presented sufficient evidence of the causal connection between her protected activity and defendants' adverse actions.

### 3.      Pretext

"The plaintiff in a retaliation case must present sufficient evidence for a reasonable jury to conclude that her protected conduct was a determinative factor in a materially adverse employment action taken by the employer." *Hervey*, 527 F.3d at 722; *see Van*

*Horn v. Best Buy Stores, L.P.,* 526 F.3d 1144, 1148-49 (8th Cir. 2008); *Carrington v. City of Des Moines,* 481 F.3d 1046, 1053 (8th Cir. 2007). Based upon the summary judgment record and drawing all reasonable inferences in Campbell's favor, *see Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009); *Matsushita Elec. Indus. Co., 475* U.S. at 587*; Lisdahl v. Mayo Foundation*, 633 F.3d 712, 720 (8th Cir. 2011), Campbell has produced sufficient evidence, if believed, which would permit a trier of fact to find that the stated reason for her firing was a pretext for the true reason for her dismissal—retaliation for her filing grievances over sexual discrimination in the workplace. Viewing the facts in the light most favorable to Campbell, I am presented with the following facts: On July 2, 2007, Campbell filed personnel grievances alleging sex discrimination. Campbell was off work between July 13, 2007, and September 10, 2007. After that, Campbell missed work frequently because of illness, returning to work for only a short time at the end of 2007. She was off work all of January 2008, and part of February 2008. An investigation into Campbell's allegations of sexual discrimination ensued while Campbell was largely out of the office, culminating in the Board denying her grievances on February 1, 2008. Campbell was off work when her grievances were denied. When Campbell returned to work later in February, she discovered that Borg had sent a letter to a dangerous offender while Campbell was on leave and had put Campbell's name on it. This offender responded with a threatening letter addressed to Campbell. Borg did not tell Campbell about this incident. Campbell only learned about it when she saw the file had a notation that "a threatening letter was received." On the heals of this incident, on February 28, 2008, Campbell received a notice of disciplinary action "for [Campbell's] continued acts of insubordination by not allowing directives from your supervisor and for removing and/or altering the court notes in offender files without prior approval from your supervisor."

Defendants' Ex. D at 117; Defendants' App. at 99.   Campbell was fired that day. Campbell, however, did not alter the court notes.  Rather, Borg altered them.  I conclude the alleged circumstances of Campbell's firing, on alleged trumped up charges coming only weeks after she returned to work full time following her filing of grievances alleging sex discrimination, would permit the trier of fact to find a retaliatory motive for her firing. Thus, I deny this portion of defendants' Motion for Summary Judgment.

### F.  First Amendment Retaliatory Discharge

Campbell also contends that defendants violated her First and Fourteenth Amendment rights when they retaliated against her after she raised concerns regarding the inclusion of victim information in the Third Judicial District's files and/or reports which were disclosed to domestic violence perpetrators.  Defendants seek summary judgment on Campbell's First/Fourteenth Amendment retaliation claim.   Defendants assert that Campbell was not speaking as a citizen when she voiced her concerns over the inclusion of victim information, so her speech was not protected by the First Amendment. Defendants alternatively argue that the Third Judicial District is not amendable to suit for damages under § 1983, and Hall is entitled to qualified immunity from liability for damages.  In response, Campbell concedes that Hall, and not the Third Judicial District, is the appropriate defendant under § 1983.[25]  Campbell contends she complained about the

---

[25]Campbell's § 1983 claim against the Third Judicial District fails because it is not a person acting under color of state law. *See Lapides v. Bd. of Regents,* 535 U.S. 613, 617 (2002)(noting "a State is not a 'person' against whom a § 1983 claim for money damages might be asserted."); *Howlett v. Rose,* 496 U.S. 356, 365 (1990) ("*Will* establishes that the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court."); *Will*
(continued...)

Third Judicial District's change in the BEP's policies, which she believed impacted victim safety, in her private capacity as a private citizen at meetings of the Community Coalition and, thus, her complaints were protected speech.   She argues further that because Hall's conduct violated her clearly established First Amendment rights, which a reasonable person would have known, Hall is not entitled to qualified immunity for his actions.

### 1.     Prima facie *case of retaliation*

"'A public employer may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'"   *Rynders v. Williams*, 650 F.3d 1188, 1194 (8th Cir. 2011) (quoting *McGee v. Public Water Supply, Dist. No. 2 of Jefferson Cnty., Mo.,* 471 F.3d 918, 919 (8th Cir. 2006) (internal quotation marks omitted)).   However, "[a] public employee's personal complaints to his employers, even if they are about a matter of public interest, do not constitute protected speech." *Lesher v. Reed*, 12 F.3d 148, 151 (8th Cir. 1994).   As the Eighth Circuit Court of Appeals has explained:

> A public employee retains a degree of First Amendment protection when she speaks as a citizen addressing matters of public concern. *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). But if speech is outside this category, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* at 418, 126 S. Ct. 1951. In particular, "when public employees make statements pursuant to their official duties, the employees are not speaking as

---

[25](...continued)
*v. Mich. Dept. of State Police,* 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *see also McLean v. Gordon*, 548 F.3d 613, 619 (8th Cir. 2008).   Therefore, this portion of defendants' Motion for Summary Judgment is granted.

> citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S. Ct. 1951; *see Lindsey v. City of Orrick,* 491 F.3d 892, 898 (8th Cir. 2007).

*Bonn v. City of Omaha*, 623 F.3d 587, 592 (8th Cir. 2010). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983);*see Buazard v. Meridith,* 172 F.3d 546, 548 (8th Cir. 1999) ("'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context' of the speech, and that speech must relate to some 'matter of political, social or other concern to the community.'") (quoting *Connick,* 461 U.S. at 146-47).

To establish a *prima facie* case of retaliation based on the First Amendment, Campbell must prove: (1) she engaged in protected speech, (2) defendants took an adverse employment action against her, and (3) her speech was a motivating factor in the adverse action taken against her. *See Rynders*, 650 F.3d at 1194; *Davenport v. University of Ark. Bd. of Trustees*, 553 F.3d 1110, 1113 (8th Cir. 2009); *Davison v. City of Minneapolis*, 490 F.3d 648, 654-55 (8th Cir. 2007); *Littrell,* 459 F.3d at 922; *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 801 (8th Cir. 2004); *see also Okruhlik v. University of Ark.,* 395 F.3d 872, 878 (8th Cir. 2005) (noting the same analysis applies to First Amendment and Title VII retaliation claims). "Whether speech was a motivating factor 'is a question of fact, but the sufficiency of the evidence to create an issue of fact is a question of law.'" *Littrell*, 459 F.3d at 922 (quoting *de Llano v. Berglund,* 282 F.3d 1031, 1036 (8th Cir. 2002)). If Campbell meets this burden, then the burden of proof shifts to the employer to show that it would have taken the same action regardless of her free speech activities. *See*

*McCullough v. University of Ark. for Med. Sciences*, 559 F.3d 855, 865 (8th Cir. 2009); *Altonen v. City of Minneapolis,* 487 F.3d 554, 559 (8th Cir. 2007); *Cox v. Dardanelle Pub. Sch. Dist.,* 790 F.2d 668, 672-676 (8th Cir. 1986).

Defendants contend that Campbell's discussions with the Community Coalition were in her official capacity.  They note that Campbell went to numerous community events in order to build awareness and act as a liaison for various agencies and officials in the domestic violence area and the BEP, including her dealings with the Community Coalition. Campbell counters that her complaints about the Third Judicial District's changes to BEP's policies were made in her capacity as a private citizen at meetings of the Community Coalition.  She points out that she was the chairperson of the Community Coalition in her capacity as a private citizen.  Defendants respond by pointing to Campbell's deposition testimony in which she stated that after she lost her flex time and could no longer work past 4:30 p.m., she quit attending certain events in the evenings that she previously attended as part of her job.  Campbell, however, did not specifically testify that she ceased attending Community Coalition meetings.  Moreover, the specific content, form, and context in which Campbell voiced her objections at the Community Coalition meetings do not appear in the summary judgment record.  Thus, I find the summary judgement record does not permit me to conclude, as a matter of law, whether Campbell's complaints at the Community Coalition meetings about the policy changes to the BEP which she believed violated the Duluth Model and put the safety of victims of domestic violence at risk, were made in her official capacity or her private capacity.  *See McCullough*, 559 F.3d at 866 ("'When speech relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern.' Motivation is gauged by evaluating the speech's content, form, and context.") (citation omitted)

(quoting *Altonen*, 487 F.3d at 559).  Therefore, this aspect of defendants' Motion for Summary Judgment is denied.

### 2.   *Qualified immunity*

I turn next to the question of whether Hall is entitled to qualified immunity from liability for damages on Campbell's First/Fourteenth Amendment claim.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see Johnson v. Carroll*, --- F.3d ---, 2011 WL 4634221, at *3 (8th Cir. Oct. 7, 2011); *Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011).  In *Pearson,* the United States Supreme Court offered this explanation of the reasoning behind the concept of qualified immunity:

> "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* In fact, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"

*Pearson,* 555 U.S. at 231 (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)) (Kennedy, J., dissenting).  The doctrine "allows officers to make reasonable errors so that they do not always err on the side of caution for fear of being sued." *Amrine v. Brooks,* 522 F.3d 823, 831 (8th Cir. 2008) (internal quotation marks omitted).

Since the *Pearson* decision, the Eighth Circuit Court of Appeals has repeated the following two part test for determining whether an official is entitled to qualified immunity:  "we ask (1) whether the facts alleged or shown, construed in the light most

favorable to [the nonmoving party], establish a violation of a constitutional . . . right, and (2) whether that constitutional right was clearly established as of [the date of the alleged incident], such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009) (citing *Pearson,* 555 U.S. at 232; *Saucier v. Katz,* 533 U.S. 194, 201 (2001), overruled in part by *Pearson,* 555 U.S. at 236); *see Johnson*, --- F.3d ---, 2011 WL 4634221, at *3; *Fields*, 652 F.3d at 890. Under *Pearson,* I have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *see Johnson*, --- F.3d ---, 2011 WL 4634221, at *3; *Fields*, 652 F.3d at 890. The official is entitled to qualified immunity unless the answer to both of these questions is yes. *Krout*, 583 F.3d at 564.

### a. A violation of a constitutional right

Taking up the first prong of the qualified immunity analysis, for the reasons discussed above, I conclude that the alleged facts construed in the light most favorable to Campbell, establish a violation of her First Amendment right to freedom of speech. Campbell alleges that she complained about the Third Judicial District's changes to BEP's policies in her capacity as a private citizen at meetings of the Community Coalition. After voicing her complaints, Campbell alleges that she was subjected to hostile stares in the workplace and then fired on fraudulent disciplinary charges. These facts, if believed, would permit the trier of fact to find a retaliatory motive for her firing and a violation of her First Amendment right of free speech. *See Rynders*, 650 F.3d at 1194 (holding

summary judgment inappropriate where genuine issue of material fact generated over whether county official fired public employee over employee's writing letter to editor criticizing county's "unjustifiably refusing" to raise county employees' wages).

### b. Clearly established right at the time

Under the second prong in the qualified immunity analysis, I must determine whether the First Amendment right to free speech asserted by Campbell was clearly established at the time the events took place. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Johnson*, --- F.3d ---, 2011 WL 4634221, at *5 (quoting *Pearson,* 555 U.S. at 244). "'A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Johnson*, --- F.3d ---, 2011 WL 4634221, at *5 (quoting *Brown v. Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *see Andrews v. City of W. Branch,* 454 F.3d 914, 919 (8th Cir. 2006) (holding that a right is "clearly established" if "a 'reasonable offic[ial] would understand that what he is doing violates that right.'")(quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The United States Supreme Court has directed courts not to take an overly broad view of what constitutes clearly established law:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."

*Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)) (citation omitted). This second step in the qualified immunity analysis "is a

'fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad proposition.'" *Janis v. Biesheuvel,* 428 F.3d 795, 799 (8th Cir. 2005) (quoting *Littrell v. Franklin,* 388 F.3d 578, 583 (8th Cir. 2004)).  However, "'[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" *Johnson*, --- F.3d ---, 2011 WL 4634221, at *5 (quoting *Brown*, 574 F.3d at 499 (internal quotation marks omitted)); see *Hill v. McKinley,* 311 F.3d 899, 901 (8th Cir. 2002) (observing that "a precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional.").

On February 28, 2008, the date Campbell was fired, federal courts had held that "[a] public employer 'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" *McGee,* 471 F.3d at 919 (quoting *Rankin v. McPherson,* 483 U.S. 378, 383 (1987) (citation omitted)).  The United States Supreme Court had recognized that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006); *see Connick,* 461 U.S. at 147 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government").  As discussed above, construing the facts in the light most favorable to Campbell, Campbell's firing in response to her speaking as a private citizen about a matter of public concern, domestic abuse victims' safety, would violate her clearly established rights under the First Amendment.  Therefore, this portion of defendants' Motion for Summary Judgment is also denied.

### G.  Age Discrimination Claim

Finally, I take up defendants' claim for summary judgment on Campbell's age discrimination claim under the ICRA, IOWA CODE CH. 216.  Under the ICRA, employers are precluded from taking adverse employment actions against employees because of their age.  *See* IOWA CODE § 216.6(1)(a); *McCune v. State*, 7891 N.W.2d 102, 2010 WL 624900, at *2 (Iowa Ct. App. Feb. 24, 2010) (unpublished table decision) ("Under the Iowa Civil Rights Act, it is unlawful to discriminate against an employee on the basis of the employee's age."); *see also Newberry v. Burlington Basket Co.,* 622 F.3d 979, 982 (8th Cir. 2010) ("The ICRA, like the ADEA, provides for liability when a defendant discharges an employee 'because of' age.").

Generally, when considering age discrimination claims brought under the ICRA, the Iowa courts "turn to federal law interpreting the Age Discrimination in Employment Act (ADEA)." *Weddum v. Davenport Community School District,* 750 N.W.2d 114, 118 (Iowa 2008) (citing *McMannes v. United Rentals, Inc.,* 371 F. Supp. 2d 1019, 1027 (N.D. Iowa 2005)); *see also Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (observing that Iowa courts traditionally turn to federal law for guidance in evaluating the ICRA). "Federal law, however, is not controlling." *Vivian,* 601 N.W.2d at 873.  Therefore, I too will look to federal law for guidance in evaluating Campbell's ICRA age discrimination claim.

"Under the Iowa Civil Rights Act, a plaintiff may prove discrimination with direct evidence or by the indirect, burden shifting method of proof established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Reiss v. ICI Seeds, Inc.*, 548 N.W.2d 170, 174 (Iowa Ct. App. 1996); *see King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) ("A plaintiff may establish her claim of intentional

age discrimination through either direct evidence or indirect evidence."); *see also Ward v. Int'l Paper Co.,* 509 F.3d 457, 460 (8th Cir. 2007); *Spencer v. Stuart Hall Co.,* 173 F.3d 1124, 1127 (8th Cir. 1999). Each of these types of ADEA claims has slightly different elements. *Spencer,* 173 F.3d at 1127 (citing *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 609 n.1 (8th Cir. 1997)). Here, Campbell has not provided direct evidence of discrimination, therefore, her age discrimination claim, based on circumstantial evidence, is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).[26] *See King,* 553 F.3d at 1160; *Loeb v. Best Buy, Inc.,* 537 F.3d 867, 872 (8th Cir. 2008); *Fitzgerald v. Action, Inc.,* 521 F.3d 867, 871 (8th Cir. 2008); *Riley v. Lance, Inc.,* 518 F.3d 996, 1000 (8th Cir. 2008); *Morgan v. A.G. Edwards & Sons, Inc.,* 486 F.3d 1034, 1042 (8th Cir. 2007); *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir. 1999). The parties hotly dispute, however, whether the record generates a genuine issue of material fact as to circumstantial evidence of age discrimination under the *McDonnell Douglas* burden-shifting analysis. Therefore, I will first set out the circumstantial evidence paradigm, followed by an analysis and resolution of this portion of defendants' Motion for Summary Judgment.

---

[26]"'Direct evidence is that which demonstrates a specific link between the challenged employment action and the alleged animus.'" *Yates v. Rexton, Inc.,* 267 F.3d 793, 799 (8th cir. 2001) (quoting *Kells v. Sinclair Buick-GMC Truck, Inc.,* 210 F.3d 827, 835 (8th Cir. 2000)); *see Browning v. President Riverboat Casino-Mo., Inc.,* 139 F.3d 631, 634 (8th Cir. 1998) ("'Direct evidence'" has been interpreted as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision.") (quoting *Thomas v. First Nat'l Bank,* 111 F.3d 64, 66 (8th Cir. 1997), which in turn quotes *Kriss v. Sprint Communications Co.,* 58 F.3d 1276, 1282 (8th Cir. 1995)).

### 1.    *The circumstantial evidence paradigm*

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *Tuttle v. Missouri Dept. of Agriculture*, 172 F.3d 1025, 1029 (8th Cir. 1999); *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 435 (8th Cir. 1993). The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason. *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995). As to the first stage of the *McDonnell Douglas* burden-shifting analysis, the Iowa Supreme Court has explained that to establish a prima facie case of intentional age discrimination under the ICRA, a plaintiff must show that: she was "in a protected age group, qualified for the job, discharged, [and] replaced by a younger person." *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 453 (Iowa 1989); *see Sievers v. Iowa Mut. Ins. Co.*, 581 N.W.2d 633, 638 (Iowa 1996) (holding that to establish a *prima facie* case under the ADEA a plaintiff must show that "'[she] was a member of a protected class, performing [her] work satisfactorily, and had adverse action taken against [her].'" ) (quoting *Vaughan v. Must, Inc.,* 542 N.W.2d 533, 538 (Iowa 1996)); *Bearden v. Int'l Paper Co.*, 529 F.3d 828 (8th Cir. 2008) (explaining that to establish a *prima facie* case under the ADEA a plaintiff must show that: "(1) [she] was a member of the protected group (at least 40 years old); (2)[she] was qualified to perform the job; (3)[she] suffered an adverse employment action; and (4) circumstances permit an inference of discrimination."); *see also Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 642 (8th Cir. 2008); *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1039-40 (8th Cir. 2007); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004); *Mayer v. Nextel*

*West Corp.*, 318 F.3d 803, 806-07 (8th Cir. 2003).[27] "Once established, the prima facie case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995); *accord Tuttle*, 172 F.3d at 1029; *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995); *Kobrin v. University of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *See Wing v. Iowa Lutheran Hosp.*, 426 N.W.2d 175, 178 (Iowa Ct. App. 1988); *see also   Sievers*, 581 N.W.2d at 638; *Vaughan,* 542 N.W.2d at 538; *Tuttle*, 172 F.3d at 1029; *White*, 985 F.2d at 435.   The employer's explanation of its actions must be "clear and reasonably specific," *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981), but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)).   If the employer meets this burden of production, the analysis differs from federal law on the causation standard for establishing age discrimination.   In *Deboom v. Raining Rose, Inc.,* 772 N.W.2d 1, 13-14 (Iowa 2009), a case decided after *Gross,* the Iowa Supreme Court determined that the causation standard in ICRA discrimination cases is that a "plaintiff need only demonstrate 'termination occurred under circumstances giving rise to an inference of discrimination' and his or her status as a member of a protected

---

[27]An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998).

class was *a* determining [or motivating] factor in the decision to terminate employment." *Deboom,* 772 N.W.2d at 13 (citations omitted). In *Schott v. Care Initiatives,* 662 F. Supp. 2d 1115 (N.D. Iowa 2009), I interpreted *Deboom* as follows:

> Notwithstanding that the Iowa Supreme Court did not mention *Gross* in its analysis, this court believes that it could not be clearer that the Iowa Supreme Court does *not* impose a 'but for' causation standard in any ICRA employment discrimination case, based on age or any other protected characteristic, and that the appropriate causation standard in such cases is 'motivating factor.' In short, the causation standards for [a plaintiff's] age discrimination claims under federal and state law are *different,* as a matter of law, even if the same analytical framework is otherwise applicable to the two claims.

*Id.* at 1120.

### 2.    *Analysis—plaintiff's showing of pretext*

Because the parties do not dispute that Campbell has established a *prima facie* case of age discrimination and that defendants have, in turn, produced evidence that Campbell's firing was made for legitimate, non-discriminatory reasons, I need only consider whether defendants' proffered legitimate, non-discriminatory reasons for her firing were pretexts for age discrimination   I find that Campbell has presented evidence supporting an inference of age discrimination which rebuts defendants' asserted non-discriminatory reasons for her firing.   Specifically, Campbell points to a number of comments made by Hall to her which she claims are evidence of Hall's age animus and are, therefore, relevant to the issue of pretext.  Campbell claims that during a meeting with Hall on December 7, 2006, Hall commented on her age and that she did not like change. Campbell also claims that in meetings with Hall on January 8, 2007, January 22, 2007, and February 21, 2007, Hall brought up Campbell's age, commenting that she didn't like

change because she was older and it was harder for older people to adjust to change. Campbell was in her mid-fifties at the time of Hall's comments. While Hall denies he made such statements, I must view all the facts in the light most favorable to the nonmoving party, here Campbell, and give her the benefit of all reasonable inferences that can be drawn from the facts. *See Ricci*, 129 S. Ct. at 2677; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587*; Lisdahl*, 633 F.3d at 720. While the alleged comments by Hall were not made during the decisional process, they, nonetheless, are "circumstantial" evidence of an age discriminatory animus toward Campbell. This is because such repeated sage-related stereotyping comments could well be viewed by the factfinder as evidencing a discriminatory animus towards older workers. Similar comments that an employee was unwilling and unable to "adapt" to change, have been found to support an inference of age discrimination. *See Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507 n.4 (5th Cir. 1988). While I view it as a close question, I conclude that Hall's alleged statements, when considered in conjunction with Campbell's *prima facie* case and showing of pretext, raise a genuine issue for trial on the ultimate question of age discrimination *vel non. See Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006). Therefore, defendants' Motion for Summary Judgment is denied as to Campbell's age discrimination claim against Scholl for injunctive relief.

## III.  CONCLUSION

For the reasons discussed above, because I conclude that genuine issues of material fact have been generated in this case, defendants' Motion for Summary Judgment is **denied** as to:   Campbell's Title VII claim of sex discrimination and retaliation; Campbell's First/Fourteenth Amendment retaliation claim; and Campbell's ICRA claims for age and

sex discrimination and retaliation against Scholl in his official capacity for injunctive relief. Defendants' Motion for Summary Judgment is **granted** as to:  all of Campbell's state law claims against the Third Judicial District; and all of Campbell's state law claims against Scholl for monetary damages.

**IT IS SO ORDERED.**

**DATED** this 22nd day of November, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA